Ranlet v. SSA                          CV-97-125-JD  02/20/98

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Daniel Ranlet

    v.                                    Civil No. 97-125-JD

John J. Callahan,
Acting Commissioner, SSA


                              O R D E R

    The plaintiff, David Ranlet, brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g),

seeking review of a final decision of the defendant, the

Commissioner of the Social Security Administration

("Commissioner"), denying his claim for benefits under the Act.

Before the court are the plaintiff's motion for an order

reversing the Commissioner's decision (document no. 5) and the

defendant's motion for an order affirming the Commissioner's

decision (document no. 8).


                            Background

    Pursuant to Local Rule 9.1, the parties have filed the

following joint statement of material facts, which the court

incorporates verbatim:

                           Introduction

        Plaintiff filed an application for Supplemental
    Security Income ("SSI") payments (Tr. 91-94), based on
    disability, on June 24, 1993, alleging an inability to
    work due to a back condition, cataracts and a gall-
    stone, and resulting pain in his back, legs, neck and

arms (Tr. 33, 116). Plaintiff has an eighth grade education (Tr. 120), and past work experience as an assembler, shoe shop cementer, tacker, security guard, and press punch operator (Tr. 42-45, 120).

### Medical Evidence

The medical record indicates that the plaintiff was referred for physical therapy (PT) for his back condition in August 1992 (Tr. 139). Plaintiff was next seen for diagnostic imaging in November 1992 (Tr. 150-151); this revealed a negative thoracic dorsal spine and only hyper lordosis in his lumbar spine, with a questionable gallstone.

Plaintiff was also treated by Dr. George B. Neal, a neurologist. The plaintiff underwent an MRI, and the results showed a herniated disc (Tr. 37). Because of the lumbar disc herniation, Dr. Neal prescribed physical therapy (Tr. 140). He was discharged from physical therapy with an independent home program because the physical therapy had not been helpful (Tr. 162).

In December 1992, both an electromyogram (EMG)[1] and nerve conduction velocity (NCV) studies were found to be normal, with no evidence of lumbosacral radiculopathy[2] or peripheral neuropathy[3] (Tr. 152-153). Additionally in December, a physical examination performed at the Neurology Associates of Southern New

---

[1]An electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. Dorland's Illustrated Medical Dictionary (Dorland's), 28th ed., at p. 537.

[2]Disease of the nerve roots. Id. at p. 1404.

[3]A functional disturbance or pathological change in the peripheral nervous system. Id. at p. 1132.

Hampshire revealed no definite weakness or sensory loss, and noted that the plaintiff's reflexes were normal and symmetrical (Tr. 154).

An MRI of the plaintiff's lumbar spine, performed on December 8, 1992, found a small focal disc herniation at L3-4 without evidence of any significant impingement of the thecal sac or nerve roots, but with progression compared to the previous exam; and degeneration at L4-5 and L5-S1 (Tr. 159). A subsequent exam at the Neurology Associates of Southern New Hampshire again noted that the plaintiff had normal strength, reflexes and sensation, and had negative straight leg raising tests (Tr. 155). The doctors' impression was that the plaintiff had a small herniated nucleus pulposus (HNP) and possibly some musculoskeletal component.

Plaintiff was again referred to PT in January 1993 (Tr. 140-141). He was evaluated and attended several sessions; however his progress was hampered by Plaintiff overexerting himself in performing certain activities, such as lifting his wife's wheelchair[4] and shoveling snow for one and a half hours (Tr. 142-147, 149). According to Plaintiff's physical therapist, he was exacerbating his lower back symptoms with these activities (Tr. 149). Plaintiff was discharged from physical therapy on February 22, 1993 (Tr. 148).

On April 7, 1993, the plaintiff returned to the Neurology Associates of Southern New Hampshire, at which time it was noted that he had fractured his big right toe three days previously (Tr. 156). A physical examination found that the plaintiff had normal strength and reflexes, as well as negative Tinel's[5] and

---

[4]Mr. Ranlet's wife is disabled. She suffers from myotonic dystrophy and is confined to a wheelchair. Mr. Ranlet testified during his prior August 1994 hearing that he needs to lift his wife out of her wheelchair, which causes pain in his back (Tr. 35).

[5]A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It

3

Phalen's[6] signs.

In May 1993, an examination at the Neurology Associates again noted that the plaintiff's motor strength, reflexes, and plantaris[7] flexor[8] were all normal, and that his straight leg raising tests were negative (Tr. 157). Plaintiff was diagnosed with low back pain, pain in his right foot at the site of a childhood injury, and rule/out bilateral carpal tunnel syndrome. Dr. John D. Thomas, II, a physiatrist, also performed an exam of the plaintiff in May 1993 (Tr. 161-164). At this exam the plaintiff was found to have a full range of motion in his back, with normal sensation, strength, balance and coordination (Tr. 163). Additionally, the plaintiff was able to straight leg raise to 90 degrees in the sitting position, and to 80 degrees in the supine position. Further, while the plaintiff did have some tenderness in his back, no overt spasm was observed (Tr. 163). Dr. Thomas stated that his findings were fairly limited and that there certainly were no hard signs of radiculopathy, but that there could be a bit of residual myofascial involvement kicking off some "dull, achy central pain" (Tr. 163).

A second EMG, performed on May 18, 1993, was also negative (Tr. 158). Additionally, a consultative eye exam, performed on June 22, 1993 at the request of the Disability Determination Services (DDS), found that the plaintiff's corrected vision was 20/30, and that there had been no dramatic change in the plaintiff's cataracts in the past two years (Tr. 166).

Dr. Wesley R. Wasdyke examined the plaintiff on July 19, 1993 as part of a pain clinic evaluation (Tr.

---

indicates a partial lesion or the beginning regeneration of a nerve. Id. at pp. 1527, 1714.

[6]This is for the detection of carpal tunnel syndrome. Dorland's at pp. 985, 1271.

[7]Having to do with the sole of the foot. Id. at p. 1301.

[8]Any muscle that flexes a joint. Id. at p. 639.

4

168-170). Dr. Wasdyke noted that the plaintiff was able to walk normally, heel and toe walk, and get up from a squatting position (Tr. 169). Additionally, the plaintiff's strength, sensation, and reflexes were all normal and there was no tenderness in his thoracic or lumbosacral spine. Dr. Wasdyke concluded that there was no evidence of disc impingement, but that the plaintiff could have bulging discs (Tr. 169). He prescribed Amitriptyline after the plaintiff declined epidural injections, and suggested that the plaintiff refrain from lifting and doing heavy work (Tr. 169-170). Plaintiff's condition remained the same at a follow up visit with Dr. Wasdyke in August 1993 (Tr. 171).

Another MRI of the plaintiff's lumbar spine was taken on February 22, 1994 (Tr. 160). This revealed degenerative and bulging discs at L3-4, L4-5, L5-S1. In April 1994, Dr. Maurice Brunelle, a chiropractor, submitted a medical report and mental and physical assessments of the plaintiff's abilities (Tr. 174-186). The general medical report stated that Dr. Brunelle began seeing the plaintiff on April 6, 1991 and had continued to do so for the next three years, approximately once a week (Tr. 174). According to Dr. Brunelle, his most recent exam of the plaintiff was on April 5, 1994, at which time the plaintiff's left neck and scapula muscles were weak and he was not able to toe walk, but he could heel walk. Additionally, the plaintiff had a negative Lasegue[9] sign and his sensation was normal, although his lumbosacral range of motion was somewhat decreased (Tr. 174). Dr. Brunelle diagnosed the plaintiff with muscle spasm in his cervical spine and left scapula, a lower lumbar vertebral restriction, degenerative osteoarthritis, and bulging discs at L3-4, L4-5, L5-S1.

In his assessment of the plaintiff's physical abilities, Dr. Brunelle opined that the plaintiff could occasionally lift and carry up to 25 pounds, and sit, stand or walk up to 30 minutes each (Tr. 178-179). Dr. Brunelle also opined that the plaintiff could

---

[9]This is a test for sciatica. Id. at p. 1524.

occasionally climb, balance, and kneel, but could not stoop or crouch (Tr. 180). Finally, he stated that the plaintiff was restricted from exposure to heights and moving machinery (Tr. 181). As for the plaintiff's mental capacity, Dr. Brunelle opined that the plaintiff's ability to make all sorts of adjustments was good and that he could manage his own benefits (Tr. 183-186).

Since his last hearing in August 1994, Mr. Ranlet has been treated by Dr. Scibetta and Dr. Doane. On July 25, 1996, the plaintiff was examined by Dr. Paul J. Scibetta, Jr., an orthopedic specialist, who found that the plaintiff was awake, alert and oriented, with a normal gait (Tr. 314). He additionally noted that the plaintiff was able to toe raise and heel walk without difficulty, and that his straight leg raising was negative in both the sitting and supine positions. Further, the plaintiff had intact reflexes, good muscle strength, and no sensory deficit (Tr. 314). Dr. Scibetta determined that the plaintiff had no clinical findings, but complained of chronic back pain. He suggested some blood work, a bone scan, and physical therapy (Tr. 315).

Plaintiff was evaluated for physical therapy on August 6, 1996, and attended three sessions during the month of August (Tr. 318-322). In the course of these sessions, the plaintiff complained of increased back pain (Tr. 322). Additionally, during this time the plaintiff used a TENS unit on a trial basis. According to the plaintiff this did not help his pain (Tr. 322).

Finally, the plaintiff returned to Dr. Scibetta for a follow-up visit on August 29, 1996 (Tr. 317). At this time Dr. Scibetta noted that the plaintiff's bone scan and blood work had been essentially normal (Tr. 316-317). He also found that the plaintiff's physical examination was unchanged (Tr. 317). Dr. Scibetta suggested an evaluation at a chronic pain center, but the plaintiff declined this, preferring to see a neurologist on his own. Dr. Scibetta diagnosed Mr. Ranlet with chronic back pain - "at this time, I feel comfortable that I have ruled out an infectious or pathologic etiology for this patient's back pain, and

6

that, in fact, it is chronic pain in nature." (Tr. 208).

Testimony

On Remand from this Court, Mr. Ranlet testified before Administrative Law Judge Fallon in October 1996. During the hearing, Mr. Ranlet testified that in the past two years since his prior hearing, his back pain had gotten worse (Tr. 243).

Since his prior hearing before the ALJ in August 1994, Mr. Ranlet, his wife and his son moved to Bristol, New Hampshire. In this apartment their bedroom is on the second floor, where it is more difficult for Mr. Ranlet to get to. (Tr. 244). Mr. Ranlet moved to Bristol because the house in Bristol had ground floor access for his wife's wheelchair and because the rent was more reasonable. (Tr. 247).

Mr. Ranlet's typical day includes doing chores around the house and doing dishes. Both of these tasks result in pain to his lower back. (Tr. 242). Mr. Ranlet testified that he experiences constant sharp pain in his back. (Tr. 33, 243). Mr. Ranlet also does the family's laundry. However, when he lifts the clothes basket, his back hurts a lot. (Tr. 251). If he and his wife go grocery shopping together, he helps his wife into the van. (Tr. 253). Pushing the shopping cart does not hurt Mr. Ranlet's back. Id. Mr. Ranlet has his son lift the heavy groceries into the van. (Tr. 254). Mr. Ranlet experiences sharp back pain all day long without any relief. (Tr. 258).

Discussion

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a

7

rehearing."  In reviewing a Social Security disability decision, the factual findings of the Commissioner "shall be conclusive if supported by 'substantial evidence.'"  <u>Irlanda Ortiz v. Secretary of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).[10]  The court "'must uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'"  <u>Id.</u> (quoting <u>Rodriguez v. Secretary of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)); <u>accord</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  The record must be viewed as a whole to determine whether the decision is supported by substantial evidence.  <u>See</u> <u>Frustaglia v. Secretary of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Rodriguez</u>, 647 F.2d at 222.  Moreover, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the

---

[10]Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citing <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. 607, 620 (1966); <u>Benko v. Schweiker</u>, 551 F. Supp. 698, 701 (D.N.H. 1982).

8

record evidence. Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts." Irlanda Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222); see also Burgos Lopez v. Secretary of Health & Human Servs., 747 F.2d 37, 40 (1st Cir. 1984).

The ALJ is required to consider the subjective complaints of pain or other symptoms made by a claimant who presents a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." Avery v. Secretary of Health & Human Servs., 797 F.2d 19, 21 (1st Cir. 1986); accord 42 U.S.C.A. § 423(d)(5)(A) (West Supp. 1997); 20 C.F.R. § 404.1529 (1997). "[C]omplaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." Dupuis v. Secretary of Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989); see Bianchi v. Secretary of Health & Human Servs., 764 F.2d 44, 45 (1st Cir. 1985) ("The [Commissioner] is not required to take the claimant's assertions of pain at face value.") (quoting Burgos Lopez, 747 F.2d at 40). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. See 20 C.F.R. § 404.1529(d) (1997). A claimant's medical history and objective medical evidence are considered reliable indicators from which the ALJ may draw

reasonable conclusions regarding the intensity and persistence of the claimant's pain. See Avery, 797 F.2d at 23; 20 C.F.R. § 404.1529(c)(3) (1997). However, situations exist in which the reported symptoms of pain suggest greater functional restrictions than can be demonstrated by the medical evidence alone. See id.

When a claimant complains that pain or other subjective symptoms are a significant factor limiting his ability to work and those complaints are not fully supported by medical evidence contained in the record, the ALJ must undertake further exploration of other information. See Avery, 797 F.2d at 23. The ALJ must consider the claimants's prior work record; daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness and side effects of any medication taken to alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other symptoms, past or present; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain. See 20 C.F.R. § 404.1529(c)(3) (1997); Avery, 797 F.2d at 23; S.S.R. 88-13. Moreover, when assessing credibility the ALJ may draw an inference that the claimant would have sought additional treatment if the pain were as intense as alleged. See Irlanda

10

<u>Ortiz</u>, 955 F.2d at 769.  If the complaints of pain are found to be credible under the criteria, the pain will be determined to diminish the claimant's capacity to work.  <u>See</u> 42 U.S.C.A. § 423(d) (West Supp. 1997); 20 C.F.R. § 404.1529(c)(4) (1997). Finally, the court gives deference to credibility determinations made by the ALJ, particularly where the determinations are supported by specific findings.  <u>See</u> <u>Frustaglia</u>, 829 F.2d at 195 (citing <u>DaRosa v. Secretary of Health & Human Servs.</u>, 803 F.2d 24, 26 (1st Cir. 1985)).

In this case, the ALJ denied the plaintiff's claim for benefits based, <u>inter alia</u>, upon the following findings: (1) the plaintiff's complaints of disabling pain were not fully credible; (2) the plaintiff retained the residual functional capacity to perform work-related activities subject to certain limitations equivalent to a restriction to light work; and, (3) the plaintiff retained the residual functional capacity to perform his past relevant work as a security guard.  From these factual determinations, the ALJ concluded that the plaintiff was not disabled within the meaning of the Act.  The plaintiff contends that the record contains substantial evidence that he has a disability.  He also urges that the record does not contain substantial evidence to support the ALJ's determination that he is not disabled.

The court notes at the outset that the plaintiff's primary argument is misplaced. The issue is not whether the record contains substantial evidence supporting the plaintiff's position that he is disabled. See Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982). The plaintiff is entitled to a reversal of the ALJ's determination that he is not disabled only if he demonstrates that the ALJ's decision is not supported by substantial evidence. See Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez, 647 F.2d at 222); see also Richardson, 402 U.S. at 401. The court accordingly considers the evidence that supports the ALJ's determination that the plaintiff is not disabled in light of the record as a whole to determine whether it is substantial. See Frustaglia, 829 F.2d at 195.

I.   The Plaintiff's Subjective Complaints of Disabling Pain

The ALJ found that the plaintiff's complaints of disabling pain were not fully credible. He questioned the plaintiff, as required by Avery, about the following factors: prior work record, see, e.g., Tr. at 41-45, 239; daily activities, see, e.g., Tr. at 250-51, 258-60, 264-65; location, duration, frequency and intensity of pain, see, e.g., Tr. at 242-44; precipitating and aggravating factors, see, e.g., Tr. at 258,

12

263; type, dosage, effectiveness and side effects of medication, see, e.g., Tr. at 257; treatment other than medication, see, e.g., Tr. at 256-57, 269, 283; and, measures used to relieve pain or other symptoms, see, e.g., Tr. at 267-68, 282-84. After having an opportunity to assess the plaintiff's demeanor and weigh the medical evidence, the ALJ concluded that his subjective complaints of pain were not entirely credible. See Tr. at 224. Such credibility determinations are the purview of the ALJ. See Irlanda Ortiz, 955 F.2d at 769.

The ALJ relied on the plaintiff's testimony to conclude that he engages in a wide variety of volitional activities. The plaintiff plays Nerf ball with his son. See Tr. at 264. He is able to visit relatives, see Tr. at 248, and go for mile-long walks, see Tr. at 268. The plaintiff can vacuum, see Tr. at 250, do the laundry, see Tr. at 251, take out the trash, see Tr. at 258-59, prepare meals, see Tr. at 251, do dishes, see Tr. at 250, and grocery shop, see Tr. at 253.

The ALJ also concluded that the plaintiff's history of seeking medical treatment is inconsistent with the degree of pain he describes. See Tr. at 224. The plaintiff sought treatment from only two physicians, Dr. Paul J. Scibetta, Jr. and Dr. Peter G. Doane, in the two years between his first and second hearings before the ALJ. See Tr. at 282. The plaintiff only saw Dr.

13

Scibetta twice and engaged for a short time in physical therapy recommended by Dr. Scibetta, which he discontinued because he felt it was not helping. See id. Dr. Scibetta recommended that the plaintiff seek an evaluation at a chronic pain clinic, but the plaintiff has chosen not to follow up. See Tr. at 284-85. The plaintiff saw Dr. Doane only once. See Tr. at 213. In addition, several physicians have reported that the plaintiff is not interested in returning to work. See Tr. at 222.

The record provided an adequate basis from which the ALJ properly could have concluded that the plaintiff's complaints of pain were inconsistent with his daily activities and his failure to seek additional medical treatment. Therefore, the ALJ's conclusion that the plaintiff's subjective complaints of pain were not fully credible was supported by substantial evidence.

II. The Plaintiff's Residual Functional Capacity

The ALJ found that the plaintiff retained the residual functional capacity to perform a range of work-related activities subject to the following limitations: the need to sit and stand at his option; no lifting and carrying more than twenty pounds occasionally and ten pounds frequently; no prolonged sitting, standing, or walking; no pushing and pulling more than twenty pounds occasionally and ten pounds frequently; no repetitive

14

above shoulder reaching, pushing or pulling with the hands or feet, or bending; no tasks requiring fine binocular vision; and no working at heights, around moving machinery, on uneven surfaces, or in temperature extremes. <u>See</u> Tr. at 226. The ALJ concluded that these limitations amount to a capacity to perform only light work. <u>See</u> Tr. at 222. The list of limitations is comprehensive, and it reflects the ALJ's careful consideration of the medical evidence, including the effect of the plaintiff's pain.

Dr. Scibetta, the physician who most recently examined the plaintiff, diagnosed him with chronic back pain. Dr. Scibetta determined that the plaintiff had no clinical findings. Thus, the physician who most recently examined the plaintiff concluded that he had no physical symptoms other than pain and that the pain had no observable cause. A report more favorable to the plaintiff's position was submitted by his chiropractor, Dr. Maurice Brunelle. In April 1994, Dr. Brunelle opined that the plaintiff could occasionally lift and carry up to 25 pounds, could sit, stand, or walk up to thirty minutes each, could occasionally climb, balance, and kneel, could not stoop or crouch, and should not be exposed to heights or moving machinery. The ALJ's conclusions as to the plaintiff's limitations closely follow Dr. Brunelle's conclusions.

15

The record provided an adequate medical basis from which the ALJ properly could have concluded that the plaintiff retained the functional capacity for light work.  Therefore, the ALJ's conclusion was supported by substantial evidence in the record.

III. <u>The Plaintiff's Ability to Perform Past Relevant Work</u>

The ALJ concluded that, based on the plaintiff's residual functional capacity, the plaintiff was capable of performing his past relevant work as a security guard.  He based this determination in part on the testimony of a vocational expert, to whom the ALJ presented hypothetical questions based on his determinations of the plaintiff's situation.  The vocational expert also testified that an individual such as the plaintiff could engage in jobs such as a cashier, assembler, and packer, all of which exist in the New Hampshire and national economies. The plaintiff has not contested the vocational expert's testimony, but instead has urged that the hypothetical questions posed by the ALJ do not accurately reflect the plaintiff's limitations.  However, because the ALJ's conclusions about the plaintiff's capacity were supported by substantial evidence, the plaintiff has failed to undermine the basis for the ALJ's determination that the plaintiff is capable of his past relevant work.

16

The record provided an adequate basis from which the ALJ properly could have concluded that the plaintiff was capable of performing his past relevant work as a security guard. Therefore, the ALJ's conclusion that the plaintiff was not disabled was supported by substantial evidence in the record.[11]

## Conclusion

Each of the findings of the ALJ, including his ultimate conclusion that the plaintiff was not disabled, was supported by substantial evidence in the record. Therefore, the plaintiff's arguments fail to demonstrate that he is entitled to a reversal of the ALJ's decision. The plaintiff's motion for an order reversing the Commissioner's decision (document no. 5) is denied. The defendant's motion for an order affirming the Commissioner's

---

[11]The ALJ also noted that, even if the plaintiff was not capable of his past relevant work as a security guard, his residual functional capacity was such that the Medical-Vocational guidelines ("the grid") would compel a finding that he was not disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1997). Given the plaintiff's age and limited education, the ALJ properly found that the plaintiff was not disabled. See id., Rule 202.17 (unskilled light work); Rule 202.18 (light work, non-transferable skills); Rule 202.19 (light work, transferable skills); see also id., Rule 201.18 (unskilled sedentary work); Rule 201.19 (sedentary work, non-transferable skills); Rule 201.20 (sedentary work, transferable skills).

17

decision (document no. 8) is granted.  The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

February 20, 1998

cc:  Vincent A. Wenners, Esquire
     David L. Broderick, Esquire